JONES, JUDGE:
Sometime in the early 1960’s the Economic Development Administration (EDA) of the United States Department of Commerce announced the availability of federal funds for the construction of recreational facilities in the State of West Virginia. The State’s responsibility for this program was assigned to the respondent, Department of Natural Resources (DNR), and DNR retained the services of The Architects Collaborative (TAC), a well-known and highly regarded architectural firm of Cambridge, Massachusetts, for purposes of preliminary studies of the feasibility of several proposed State Park projects. It was finally determined that the State would build what now have become widely known and popular State Parks, namely, Hawks Nest State Park, Canaan Valley State Park, Pipestem State Park and Twin Falls State Park. TAC was employed by DNR *149 to serve as architect engineer for all of the projects. TAC sub-contracted the detailed design work and construction supervision to Irving Bowman & Associates (IBA), an architectural and engineering firm in Charleston, West Virginia. The claim of Baltimore Contractors, Inc., hereinafter referred to as Baltimore, involves only the Pipestem and Twin Falls projects.
In an effort to help West Virginia contractors, the two projects were divided into numerous smaller projects and individual plans and specifications were prepared by TAC. A satisfactory bidder was found for the golf courses, but otherwise the multi-package plan proved unproductive. Then, with encouragement from Baltimore and other large contractors, the Pipestem and Twin Falls projects, minus golf courses, were consolidated. This was done by modification of the bid proposal and by eight addenda, tying the numerous contracts together into one large contract, upon which bids were asked and received. While there was tacit approval of this procedure by all bidders, who presumably knew what they were bidding on, the language employed in the consolidation did result in troublesome questions of interpretation, particularly as regards Addendum No. 4 pertaining to the Pipestem project, which will be alluded to further herein.
A site inspection was held at Pipestem sometime in August, 1967. The meeting was attended by representatives of TAC, DNR, two contractors who later bid on the contract and a road contractor interested in the separate contract for construction of a road into Pipe-stem. While a notice of the meeting was sent to Baltimore, it did not attend. The group inspected the site on foot and by automobile, and also examined models of both Pipestem and Twin Falls. Jay Henry, Chief Engineer for State Parks of DNR, testified that bidders at the pre-bid inspection were told that they took the roads “as is”. With specific reference to Twin Falls, Mr. Henry further testified as follows: “I told them there was the road at one end that was temporary and a road at the other end which was going to be re-built, but that’s about the only extent that I can recall on the discussion at Twin Falls.”
A site inspection was made by Dale Willey, an employee in the Estimating Department of Baltimore. On September 6, 1967, he met with Sam Flournoy, an employee of DNR, in Charleston and was *150 driven by Mr. Flournoy to Pipestem and, according to Mr. Willey’s testimony, on to Twin Falls and back to Charleston. Mr. Flourney has no recollection of taking Mr. Willey to Twin Falls but instead recalls stopping at Hawks Nest. In any event, Mr. Willey kept no records and made no written reports of his inspection; and subsequent events would indicate that nothing he saw or learned posed any problem or required any explanation or action so far as Baltimore was concerned.
On October 20, 1967, Baltimore submitted a bid for the construction of certain buildings and related structures and facilities at Pipe-stem State Park, Summers County, West Virginia, and Twin Falls State Park, Wyoming County, West Virginia. The bid was accepted and the contract in the total amount of $11,576,300 was awarded to Baltimore, and entered into by the parties on February 19, 1968. On February 27, 1968, a Notice to Proceed directed Baltimore to commence work on April 1, 1968. The contract called for completion within 460 calendar days, and provided for the assessment of liquidated damages in the amount of $150 “for each consecutive calendar day after the above established completion date that the work remains incomplete”.
Early in April, 1968, DNR, having become disenchanted with TAC by reason of a lack of communication and cooperation in the correction of design errors and other disagreements, canceled its contract with TAC, thereby also terminating the services of IBA, and employed Zando, Martin & Milstead (ZMM), Architects and Engineers, of Charleston, West Virginia.
Baltimore has filed three separate claims, aggregating $1,191,-944.54, arising out of its contract with DNR, as follows:
1. For failure to provide and maintain access roads for the Pipe-stem and Twin Falls projects, Baltimore’s petition claims damages for direct expenses of providing access, additional overhead expenses due to delay, additional heating expense due to delay, and loss of efficiency at Pipestem, in the amount of $506,353.08, and for labor and truck rental expense for transporting workers from highway to job site, labor, equipment, utilities attributable to delay and other additional expenses at Twin Falls in the amount of $98,151.67, a total of $681,733.82. Baltimore now claims a larger sum “as adjusted in accordance with the testimony introduced at trial” in the new total amount of $712,105.36.
*151 2. For delays resulting from errors in design of window walls and failure to timely approve window wall shop drawings, Baltimore’s petition alleges damages in the amount of $313,697.57. Eliminating the overall delay expense in connection with the alleged failure of DNR to furnish road access to both projects, and further eliminating certain items which were withdrawn during the course of the hearings, this claim has been reduced by Baltimore to $45,778.86.
3. For additional unanticipated expenses in drilling jack holes for the two main lodge passenger elevators at Pipestem, Baltimore’s petition claims damages in the amount of $54,061.75, and indirect expense due to delay in the amount of $142,451.40, a total of $196,513.15. Counsel for Baltimore have withdrawn the claim for delay, leaving an alleged loss of $54,061.75.
Baltimore’s claim in this case, as modified, is for damages in the total amount of $811,945.97.
Much testimony was heard and many of Baltimore’s exhibits were admitted over objections of DNR, subject to later determination by the Court as to relevance and materiality. All testimony and exhibits pertaining to design errors and inaccuracies in surveys noted prior to bidding but not confirmed thereafter, are considered by the Court not to be material to the issues and will have no bearing on the Court’s decision in this case.
This case is complicated by a number of “errors and omissions” attributable in considerable degree to both the claimant and the respondent. It is clear that Baltimore hurried into this contract, bidding with knowledge of uncertainties and apparently counting on change orders to make up for any substantial misunderstandings. Anyone knowing anything about the weather and winter road conditions in the Pipestem and Twin Falls areas should have been put on notice by even a casual site inspection that questions should be asked and answers obtained regarding the relative silence of the contract documents so far as access was concerned. Both parks were located in isolated, hard-to-reach areas, Pipestem alone covering 4,000 acres. Delays in April and May, 1968, were almost entirely attributable to harsh winter weather. Attendance at the pre-bid site inspection arranged by TAC was not a requirement, but the failure of Baltimore to attend was nonetheless a mistake. The “Country Access Roads” shown on the maps furnished by DNR were never intended to carry *152 the loads in wintertime to which they were subjected. The burdensome and expensive efforts to haul materials to the sites in the bad winter weather could better have been avoided by shutting down the job temporarily or by improvement of the roads by Baltimore in mitigation of its losses. If Baltimore had been more careful in its site investigation, and had given more attention to the study and interpretation of the road access provisions in the contract documents, obvious and pressing inquiries would have been prompted and later trials and tribulations may have been avoided. “Information For Bidders”, which was one of the bid documents furnished Baltimore, contains these two pertinent paragraphs:
“11. Addenda and Interpretations. No interpretation of the meaning of the plans, specifications or other pre-bid documents will be made to any bidder orally.
Every request for such interpretation should be in writing, addressed to:
Irving Bowman and Associates at 910 Quarrier Street, Charleston, West Virginia, and to be given consideration must be received at least five (5) days prior to the date fixed for the opening of bids. Any and all such interpretations and any supplemental instructions will be in the form of written addenda to the specifications which, if issued, will be mailed by certified mail with return receipt requested to all prospective bidders (at the respective addresses furnished for such purposes), not later than three days prior to the date fixed for the opening of bids. Failure of any bidder to receive any such addendum or interpretation shall not relieve such bidder from any obligation under his bid as submitted. All addenda so issued shall become part of the contract documents.
“17. Obligation of Bidder. At the time of the opening of bids, each bidder will be presumed to have inspected the site and to have read and to be thoroughly familiar with the plans and contract documents (including all addenda). The failure or omission of any bidder to examine any form, instrument or document shall in no way relieve any bidder from any obligation in respect of his bid.”
Where maps furnished Baltimore by DNR showed State highways leading to and through the Parks, such as 18/2 at Pipestem and *153 10/15 at Twin Falls, Baltimore had reason to believe that some maintenance by the State of West Virginia would be provided. This premise is not changed by the fact that after DNR took over the Park areas, the Department of Highways abandoned all roads within the Parks and thereby divested itself of any responsibility for maintaining these roads. With DNR’s superior knowledge of the problem and with the basic necessity of road access to the work sites, DNR should have been more concerned that a clear understanding of the road access problem could be had through examination and study of the bid proposal. The aerial surveys furnished Baltimore by DNR, through TAC, were deemed unsatisfactory by both DNR and Baltimore, and when survey stakes locating the road through Pipestem could not be found, Baltimore was forced to employ Ted Ponds, the engineer who had laid out the road. It was Baltimore’s responsibility to “stake out” the buildings but the necessary starting points were not there. Baltimore’s request for a ground survey should have been granted. In several instances DNR refused additional compensation or change orders where it appears it would have been more amenable if sufficient funds had been available. DNR’s judgment necessarily was influenced by the control of funds by the federal agencies. In our opinion, both parties erred in “stonewalling” the road access problem; but the Court is constrained to say that it cannot accept the charges of fraud, bad faith, concealment, entrapment, deceit, conspiracy of silence, etc. appearing in Baltimore’s brief. DNR may have been short on money, but never in its desire to get the job done with all the cooperation it could muster from its limited personnel. DNR’s Chief Engineer, Jay Henry, throughout the construction period and on the stand as a witness for both parties, displayed a very high degree of fairness and cooperation.
Addendum No. 4, relating to Specifications for the Pipestem project, is a good example of contract language which needed interpretation before the bid letting. The original contract for the construction of the river lodge at Pipestem contained a Stated Allowance of $10,000 for “Improvement of the access road leading to river lodge for Contract Package No. 12”. Addendum No. 4 provided in part the following:
“1) Stated allowances listed in this paragraph shall apply to base bids. References to stated allowance in individual contracts, technical specification volumes, shall be ignored.
*154 2) * * *
3) Allowance for improvement of access roads is for repairing existing roads as required to provide access for construction purposes. Bidders are informed that an additional suitable access road, requiring some improvement, exists, connecting construction areas of the park with river facilities, intersecting river road at Mountain Creek.”
DNR contends that the purpose of this provision was to inform prospective bidders that the $10,000 stated allowance appearing in the original Supplemental General Conditions applicable to River Lodge could be used either for improvement of the road leading to the River Lodge from the town of Dunns or for improvement of the newly discovered road leading down the mountain from the main lodge area to the river lodge facility. On its fact this addendum applies only to “Pipestem State Park Project Contract Nos. 5, 7, 10, 11, 12, 13 and 14”, but Baltimore strongly contends that it applies not only to the entire Pipestem project, but to Twin Falls as well. Baltimore further points out that DNR personnel gave pre-bid assurances to contractors that the rock base of the permanent road at Twin Falls would be completed prior to or soon after commencement of the building construction work, later promising that it would be completed by October, 1968. While these “assurances” were never reduced to writing, they clearly were intended to be and were relied upon by Baltimore. However, the road was not ready for use during the winter of 1968-69, and Baltimore was put to large extraordinary expense in transporting both labor and materials. Interference in the use of the main access road into Pipestem by the independent construction of a new road, which involved tearing up portions of the old road while Baltimore was trying to use it, was a factor in delaying Baltimore and in causing it to have to construct temporary access roads to construction areas. The road under construction passed in front of every building on the job, and, according to one witness, “The only way we could get there was to interfere with and be interfered by the road contractor”.
The original contract completion date was July 4, 1969, and the extension of 142 days, allowed by change order, expired November 23, 1969. Beneficial occupancy of the parks was delayed until December 31, 1969, and the project was finally accepted in June, 1970. *155 There is no indication that any liquidated damages were charged against Baltimore. Acceptance of the change order extending the time for completion of the project did not waive nor prejudice Baltimore’s claims for damages due to delays attributable to DNR.
Recommending approval of change order 25A, extending for 142 days the time for completion of the contract, DNR’s Chief Engineer wrote department memoranda attributing delays in construction to a number of factors. At Pipestem as follows: (1) DNR’s unsuccessful efforts to work out a change order deleting the Visitors’ Center, Upper Tram Station, Aerial Tram, Lower Tram Station, River Lodges (30 rooms), Stable and Corral, and required facilities; (2) Indecision of DNR concerning plans to construct the access road to the Blue-stone River Complex; (3) Unsuitable foundations and excess water encountered by Baltimore in excavating for the “core” of the Earth Dam; (4) TAC error in design of window walls; (5) Redesign of Upper and Lower Tram Stations; and (6) Revisions in design of Cabins, Golf Clubhouse and Recreational Building. At Twin Falls as follows: (1) Road access, complicated by the bankruptcy of the original road contractor; (2) State Road Commission’s imposition of a 15 ton maximum load limit on the Maben-Saulsville Road, necessitating unloading from “over the road trucks” to smaller trucks; (3) Redesigning window walls; (4) Failure of TAC as-built drawings to show accurate location of irrigation cable, resulting in same being cut by pile driver; and (5) Inaccurate information for location of Cabins and Archery Course. Referring to both Parks, one of the memoranda avers that “certain delays were the result of inadequate plan information, site surveys, etc., all of which delayed the construction program of the entire work at Pipestem and Twin Falls”, and that, “The change of architect/engineer from TAC to ZMM in 1968 resulted in delays in the progress of the work”. By its own memoranda, DNR accepted responsibility for the delay factors therein mentioned, and agreed that Baltimore was entitled to 142 additional days to complete its contract.
A brief summary of Baltimore’s claim for damages resulting from road access and other general delays is as follows:
1. Pipestem direct costs $ 9,390.33
2. Pipestem extended overhead (142 days) 108,423.31
3. Pipestem winter heating (1969-70) 124,927.61
*156 4. Twin Falls costs 56,760.60
5. Twin Falls winter heating (1969-70) 68,762.63
6. Extra engineering cost (Ted Ponds) 11,200.00
7. Loss of labor efficiency 255,596.00
Total $635,420.48
Less duplications 16,198.42
$619,222.06
Home office overhead (7.4%) 45,822.43
Profit (15% — 7.4%) 47,060.87
Grand Total $712,105.36
The Court hereinabove has said that Baltimore is entitled to the Ted Ponds cost for extra engineering in the amount of $11,200.00; and the Court now further finds that Baltimore is entitled to recover damages for unwarranted delays brought about by the actions and omissions of DNR and its architects. However, the Court will make no allowance for damages beyond the contract extension of 142 days, including alleged damages for 1969-70 winter heating. As triers of the facts and arbiters of the amount of damages, the Court has weighed all of the evidence (14 volumes of testimony and 305 exhibits), and has endeavored to assess damages in a fair and just manner, considering all of the facts and circumstances, ambiguous and otherwise. Accordingly, it is the Court’s opinion that Baltimore has sustained damages by reason of delays effectively caused by DNR, and proved by a preponderance of the evidence, in the amount of $200,000.00.
Baltimore submitted its first window wall drawing for approval of ZMM on June 24, 1968. Thereafter it became apparent that there was a design error by TAC in that the design called for exposed glass areas in excess of 50 square feet, which exceeded standard wind load and thermal requirements. Two types of window units, aluminum frame windows and wooden frame windows, were required by the specifications. Final shop drawings were not approved by ZMM until October 3, 1968. While some delay was occasioned by the necessity of re-designing the window walls, the Court does not believe that this delay was critical to Baltimore’s schedule. The substitution of *157 Polarpane for Anderson windows, requested by Baltimore, consumed considerable time, probably more than it should have, but with that fault about equally divided. The use of standard wood windows and standard hardware, both requested by Baltimore, in the place of custom windows and custom hardware as shown on the drawings took additional time. The latter substitution was reluctantly agreed to by DNR for the express purpose of saving time, which it undoubtedly did. Two other questions having to do with warranties and a rather flimsy difference of opinion about what was or was not a proper acceptable color of the glass, involved much correspondence and seemingly unnecessary delay, which Baltimore did little or nothing effectively to prevent. Moreover, in view of the status of Baltimore’s work schedule at both Pipestem and Twin Falls, the Court cannot say that Baltimore could have gained any advantage in time or otherwise if an earlier approval of the drawings had been obtained. On the contrary, it appears to the Court that before they finally were ordered and delivered to the sites, Baltimore was not ready to install the window walls. The Court is of opinion not to allow Baltimore’s claim for direct cost allegedly incurred as a result of TAC’s design error, and delayed approval of shop drawings by ZMM; and as compensation for general delays is covered in the road access allowance, no award will be made to Baltimore for its separate window wall claim.
Baltimore has dropped the delay portion of its jack hole claim, but urges that under Section 21 of the Contract’s General Conditions (“Subsurface Conditions Found Different”), it is entitled to compensation for additional and reasonably unanticipated expenses incurred in drilling jack holes for the two main lodge elevators at Pipestem. The contract section referred to reads as follows:
“Should the Contractor encounter subsurface and/or latent conditions at the site materially differing from those shown on the Plans or indicated in the Specifications, he shall immediately give notice to the Architect/Engineer of such conditions before they are disturbed. The Architect/Engineer will thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the Plans or indicated in the Specifications, he will at once make such changes in the Plans and/or Specifications as he may find necessary, and any increase or decrease of cost resulting from such changes to be *158 adjusted in the manner provided in Paragraph 17 of the General Conditions.”
Baltimore, through its drilling subcontractor, Keyser Drilling Company, had successfully drilled four jack holes, 25 to 40 feet in depth, when it ran into difficulty in the drilling of the north passenger elevator jack hole at the main lodge. At about 40 feet there was a deflection of the drill bit, causing improper shaft alignment. Corrections were made but again at a depth of about 55 feet the same thing occurred. Failing to correct the deflection of the bit, this hole was filled to approximately 30 feet with concrete, and while the concrete was allowed to cure, drilling was started on the north jack hole. Again at approximately 40 feet a similar deflection of the bit was encountered. Going back to the north hole, drilling was resumed through the concrete, but alignment again was lost at about 40 feet. Samples taken from the holes indicated that an extremely hard conglomerate, slanting rock stratum was causing the drilling bit to bounce or slip off, departing from a true vertical line and the required true alignment. At this point another drilling contractor was brought to the job and although he tried other drilling techniques he, too, was unsuccessful. In January, 1969, Baltimore employed an expert drilling consultant, Dunbar Drilling of Dayton, Ohio, and in February, approximately a month later, the drilling of both jack holes had been successfully completed. It appears that Dunbar cut out one side of a steel pipe and then inserted it as a casing for the hole, so that the drill bit would be confined on the sloping side of the rock stratum and free to drill in the direction of the hole in the pipe, thereby retaining alignment.
While Baltimore undoubtedly encountered an unexpected condition in the drilling of these jack holes, it was not a subsurface condition materially differing from those shown on the Plans or indicated in the Specifications, as there was no reference anywhere in the contract documents to depths of 40 feet or more. The only pertinent reference to subsurface conditions is found in information for bidders under the heading “Test Borings”. Bidders are informed that a report of test borings is available, that the information is furnished for the convenience of the bidder and is not a part of the contract documents nor is the information guaranteed, and that any bid submitted must be based on the bidders own risk. In any event these test borings were only to a depth of about 20 feet and would not have been helpful in solving this problem. The Court is of opinion that the extra expense *159 incurred by Baltimore in this connection was not attributable to any act or omission of DNR, but on the contrary, was the probable and direct result of the failure of Baltimore to utilize a known, practical and correct drilling procedure which would have nullified the excessive costs which did occur.
In consideration of its findings, hereinbefore set out, the Court awards to the claimant, Baltimore Contractors, Inc., the sum of $200,000.00.
Judge Petroplus participated in the decision of this case, but his resignation from the Court was effective before this opinion was prepared and approved.
Judge Garden did not participate in the decision of this case.
Award of $200,000.00.